UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JENNIFER O'NEILL and TRICIA
ZAMFINO, on behalf of themselves and all
others similarly situated,

                                    Plaintiffs,

          -v-

STANDARD HOMEOPATHIC COMPANY;
HYLAND'S, INC.; CVS PHARMACY,
INC.; and TARGET CORPORATION,

                                    Defendants.

Case No. 16-CV-8687 (KMK)

<u>OPINION & ORDER</u>

Appearances:

Jeffrey I. Carton, Esq.
Myles K. Bartley, Esq.
Robert J. Berg, Esq.
Denlea & Carton LLP
White Plains, NY
*Counsel for Plaintiffs*

Judith A. Archer, Esq.
David B. Schwartz, Esq.
Jeffrey Margulies, Esq.
Stephanie Stroup, Esq.
Norton Rose Fulbright US LLP
New York, NY and Los Angeles, CA
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

          Plaintiffs Jennifer O'Neill ("O'Neill") and Tricia Zamfino ("Zamfino") bring the instant

Complaint, on their own behalf and on behalf of a putative class, alleging that they were injured

by paying for unsafe products that have since been voluntarily removed from the marketplace by

Defendants Standard Homeopathic Company ("Standard") and Hyland's, Inc. ("Hyland's"), and

which are no longer available for purchase at Defendants Target Corporation ("Target") or CVS Pharmacy, Inc. ("CVS") (collectively "Defendants"). (Am. Compl. ¶¶ 1–3 (Dkt. No. 20).) According to Plaintiffs, Defendants "made false representations about their teething products," that were in violation of New York General Business Law ("GBL") §§ 349 and 350, and also resulted in a breach of the implied warranty of merchantability and a breach of contract. (*Id.* ¶¶ 53–76.) Defendants have filed a Motion To Dismiss Plaintiffs' Amended Complaint. (*See* Defs.' Mot. To Dismiss Am. Compl. (Dkt. No. 59).) For the following reasons, Defendants' Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

For purposes of the instant Motion, the Court treats the allegations contained in the Amended Complaint as true. Plaintiff O'Neill purchased Hyland's Baby Teething Tablets on an unspecified date at Target in Newburgh, New York. (Am. Compl. ¶ 4.) Plaintiff Zamfino purchased the same product at CVS in Middletown, New York. (*Id.* ¶ 5.) O'Neill discarded a full, unused container of Hyland's Baby Teething Tablets in the wake of the Food and Drug Administration's (the "FDA") warning regarding the safety of the product in September 2016, (*id.* ¶ 4), while Zamfino discarded a full, unused container, as well as a half-filled container, of the same, (*id.* ¶ 5).

Standard, through its Hyland's division, sold various homeopathic medicines under the brand name of "Hyland's." (*Id.* ¶ 7.) As is relevant here, Standard sold Hyland's Baby Nighttime Teething Tablets, Hyland's Baby Teething Gel, Hyland's Baby Teething Tablets, and Hyland's Teething Gel at various retailers, including Target and CVS. (*Id.* ¶¶ 14, 18.) According to Plaintiffs, Standard marketed the specific product purchased by O'Neill and

Zamfino—the Hyland's Baby Teething Tablets—by claiming that the product "make[s] nights bearable, days livable, and truly make[s] the teething years way more groovy." (*Id.* ¶ 15.) In addition to these marketing statements, Standard's and Hyland's website allegedly contained a "detailed 'Safety Information'" page that included "representations that the FDA had regulated its manufacturing, and provid[ed] an overall impression that their products were safe." (*Id.* ¶ 16.) This safety information included a hypothetical regarding product safety, wherein Standard and Hyland's asserted that "a 10-pound child would have to accidentally ingest, all at the same time, more than a dozen bottles of 135 Baby Teething Tablets before experiencing certain adverse effects." (*Id.* ¶ 17 (internal quotation marks omitted).)

However, in 2010, the FDA issued a warning that Hyland's Teething Tablets may pose a risk to children, recommended that "consumers not use this product and dispose of any in their possession," (*id.* ¶ 19 (internal quotation marks omitted)), and announced that Hyland's would be issuing a recall of the product, (*id.* ¶ 20). According to Plaintiffs, the FDA warning concerned the existence of "a small amount of belladonna, a substance that can cause serious harm at larger doses," in the Hyland's Teething Tablets. (*Id.* ¶ 21.) Plaintiffs allege that the FDA's laboratory analysis showed that the belladonna was not "carefully controlled," as the Hyland's Teething Tablets were shown to "contain inconsistent amounts of belladonna." (*Id.*) Moreover, the FDA had "received reports of serious adverse events in children taking this product that [were] consistent with belladonna toxicity." (*Id.*) Ultimately, Hyland's agreed to recall the Teething Tablets in 2010 out of "an abundance of caution," although it contended that the Teething Tablets were "safe for infants and toddlers." (*Id.* ¶ 22–23 (internal quotation marks omitted).) Yet, in 2011, Hyland's reintroduced the Teething Tablets to the market, "stating it had modified its manufacturing process, and . . . claiming its products were safe." (*Id.* ¶ 24.)

Approximately four years later, in September 2015, USA Today published an article wherein the mother of an infant in Texas alleged that her child "was having five to six seizures a day after [the child] started taking Hyland's Baby Nighttime Teething Tablets." (*Id.* ¶ 25.) According to the article, "an ingredient in Hyland's homeopathic teething tablets had earlier been linked to seizures." (*Id.* ¶ 27.)

Roughly one year after the USA Today report, the FDA issued a new warning to consumers regarding certain homeopathic remedies. Specifically, the FDA stated that "homeopathic teething tablets and gels may pose a risk to infants and children," and further recommended that "consumers stop using these products and dispose of any in their possession." (*Id.* ¶ 29 (internal quotation marks omitted).) According to the FDA, these products had been linked to "adverse events . . . including seizures in infants and children who were given these products." (*Id.* ¶ 30 (internal quotation marks omitted).) The FDA also confirmed that homeopathic teething tablets and gels had "not been evaluated or approved by the FDA for safety or efficacy," in direct contrast to representations allegedly made by Defendants. (*Id.* ¶ 31 (emphasis and internal quotation marks omitted).)

In response, Hyland's maintained that it was "confident that Hyland's Baby Teething Tablets remain safe," and that the FDA's warning came as "a surprise statement." (*Id.* ¶ 33 (internal quotation marks omitted).) Hyland's also confirmed that its homeopathic products were in fact regulated by the FDA, which placed it in direct conflict with the FDA's statement. (*Id.* ¶ 34.) Nonetheless, in response to the FDA's warning, "Hyland's discontinued distribution of its teething products in the United States." (*Id.* ¶ 36.)

Then, on January 27, 2017, the FDA issued another warning regarding homeopathic teething tablets. (*Id.* ¶ 37.) At this time, the FDA "indicated that it asked Standard to recall its

teething tablets containing belladonna." (*Id.*)  The FDA's January 2017 warning confirmed that a "laboratory analysis found inconsistent amounts of belladonna . . . in certain homeopathic teething tablets, sometimes far exceeding the amount claimed on the label." (*Id.* ¶ 38 (internal quotation marks omitted).)  Due to these findings, the FDA "contact[ed] Standard directly and ask[ed] Standard to recall its homeopathic teething tablets in order to protect consumers from inconsistent levels of belladonna." (*Id.* ¶ 40 (internal quotation marks omitted).)  At the time the Amended Complaint was filed, Standard had not yet recalled the relevant products. (*Id.* ¶ 41.)  However, on April 13, 2017, Standard announced that it was recalling all Hyland's Baby Teething Tablets and Hyland's Baby Nighttime Teething Tablets sold in retail stores to consumers. (*See* Decl. of Judith A. Archer, Esq. in Supp. of Mot. To Dismiss ("Archer Decl.") Ex. B ("Recall Announcement") (Dkt. No. 61).)[1]  The recall notice stated that Standard was "notifying its distributors and retailers by mail and [was] arranging for the return of all recalled products," and further that "[c]onsumers who have products which are being recalled should discard the product." (*Id.*)  As part of the recall, consumers were told they could receive a refund by "call[ing] [the] customer service team," who will then "begin the process of refunding the product." (Archer Decl. Ex. C ("Recall FAQ").)[2]

---

[1] The Court may consider this exhibit even though it was not attached to the Complaint, as it is a publicly-filed press release filed by, and with, the FDA. *See Rivera–Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 463 n.6 (2d Cir. 2006) (holding that the court may take notice of documents in the public record); *Gale v. Smith & Nephew, Inc.*, 989 F. Supp. 2d 243, 246 n.2 (S.D.N.Y. 2013) (taking judicial notice of the FDA's public approval of a particular product); *In re Zyprexa Prods. Liab. Litig.*, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008) (stating that "[j]udicial notice can be taken of . . . press releases and news articles and published analyst reports" and taking judicial notice of certain documents made publically available by and regarding the defendants); *see also id.* ("Public documents issued by government agencies such as the Food and Drug Administration ('FDA') may also be considered.").

[2] The Court will also take judicial notice of the information publicly announced on the Hyland's website, because "the website's authenticity is not in dispute and it is capable of

Prior to Standard initiating the aforementioned recall, Defendants CVS and Target removed the Hyland's teething products from their stores. (Am. Compl. ¶ 42.) Specifically, on September 30, 2016, CVS announced that it had "voluntarily withdrawn all brands of homeopathic teething products sold in its retail stores and online at CVS.com," and that it had initiated certain in-store controls to "prevent further sale of these products." (*Id.* ¶ 43 (internal quotation marks omitted).) Target did not make an announcement regarding the homeopathic teething products, but it did "pull[] the products from its shelves and stopped making the products available on [its] website." (*Id.* ¶ 44.) Neither Target nor CVS offered any "refund, rebate, discount, or other form of compensation to consumers" when they removed the Hyland's products from their respective stores and websites. (*Id.* ¶ 45.)

### B. Procedural History

Plaintiffs filed their initial Complaint on November 9, 2016. (Dkt. No. 1.) On February 2, 2017, Defendants filed a pre-motion letter seeking to file a motion to dismiss the Complaint. (Dkt. No. 42.) In response to the pre-motion letter, Plaintiffs filed an Amended Complaint on February 3, 2017, (Am. Compl. (Dkt. No. 44)), and agreed to dismiss claims brought by former-Plaintiffs Lisa Corbett and Laura Kasiotis against former-Defendant Church & Dwight Co., Inc. and Defendants CVS and Target, (Dkt. No. 46). Plaintiffs then filed a letter in response to Defendants' pre-motion letter on February 7, 2017. (Dkt. No. 47.) The Court thereafter adopted a briefing schedule for Defendants' Motion. (Dkt. No. 50.)

In the interim, the Court referred this case to Magistrate Judge McCarthy for purposes of settlement. (Dkt. No. 52.) On June 13, 2017, in an attempt to facilitate settlement of this action,

---

accurate and ready determination." *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (internal quotation marks omitted); *see also Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (same).

the Parties proposed a revised briefing schedule extending the deadline to file the putative Motion To Dismiss. (Dkt. No. 56.) The Court then adopted this revised schedule. (Dkt. No. 57.) Unable to settle the case, Defendants filed their Motion To Dismiss and accompanying papers, dated July 15, 2017, on September 15, 2017. (Dkt. Nos. 59–61.) Plaintiffs filed their Opposition to the Defendants' Motion, dated August 18, 2017, that same day, (Dkt. No. 62), and Defendants filed their Reply, on September 15, 2017 as well, (Dkt. No. 63).

## II. Discussion

### A. Standard of Review

Defendants move to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (*See* Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.' Mem.") 7 (Dkt. No. 65).)

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are substantively identical. In deciding both types of motions, the Court must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff." *McCray v. Lee*, 2017 WL 2275024, at *2 (S.D.N.Y. May 24, 2017) (citations and internal quotation marks omitted); *see also Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003), *as amended* (Apr. 16, 2003) ("[T]he standards for dismissal under 12(b)(6) and 12(b)(1) are substantively identical."). However, "in contrast to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Sobel v. Prudenti*, 25 F. Supp. 3d 340, 352 (E.D.N.Y. 2014) (internal quotation marks omitted); *see also McCray*, 2017 WL 2275024, at *2 ("[O]n a Rule 12(b)(1) motion, the party who invokes the Court's

jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6)" (alterations and internal quotation marks omitted)).  This allocation of "the burden of proof" is "[t]he only substantive difference" between the standards of review under these two rules. *Fagan v. U.S. Dist. Court for S. Dist. Of N.Y.*, 644 F. Supp. 2d 441, 446–47 & n.7 (S.D.N.Y. 2009) (quoting *Lerner*, 318 F.3d at 128).

### 1.  Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (internal quotation marks omitted).  "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *see also Butler v. Ross*, No. 16-CV-1282, 2016 WL 3264134, at *3 (S.D.N.Y. June 14, 2016) (same).  Nevertheless, "[u]nlike Article III standing, which ordinarily should be determined before reaching the merits, statutory standing may be assumed for the purposes of deciding whether the plaintiff otherwise has a viable cause of action." *Coan v. Kaufman*, 457 F.3d 250, 256 (2d Cir. 2006) (citation omitted).  While a district court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction," "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden

of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (alteration and internal quotation marks omitted); *see also Ray Legal Consulting Grp. v. Gray*, 37 F. Supp. 3d 689, 696 (S.D.N.Y. 2014) ("[W]here subject matter jurisdiction is contested a district court is permitted to consider evidence outside the pleadings, such as affidavits and exhibits.").

### 2. Rule 12(b)(6)

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alteration, and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . . " (internal quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as true . . . ." (alteration and internal quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

B. Analysis

Plaintiffs make three claims in the Amended Complaint. First, Plaintiffs allege violations of New York GBL §§ 349–50 by Defendants Standard and Hyland's. (Am. Compl. ¶¶ 53–64.) Second, Plaintiffs allege that Defendants Target and CVS breached the implied warranty of merchantability. (*Id.* ¶¶ 65–71.) Third, Plaintiffs claim that Defendants Target and CVS breached a contractual obligation to Plaintiffs. (*Id.* ¶¶ 72–76.)

The Court will first address Defendants' Mootness and Standing arguments, because they are directed at the Court's jurisdiction. *See Anderson Grp., LLC v. City of Saratoga Springs*, 805

F.3d 34, 44 (2d Cir. 2015) ("[S]tanding is a threshold matter [that a court] must resolve before reaching the merits." (internal quotation marks omitted)); *Dean v. Blumenthal*, 577 F.3d 60, 64 (2d Cir. 2009) (per curiam) ("We lack jurisdiction if we conclude that a case is moot.").

### 1. Mootness

Defendants argue that the lawsuit is moot because Hyland's and Standard have "recalled the Products and [are] providing refunds to consumers." (Defs.' Mem 7.) A "case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496 (1969). The burden on a defendant "to demonstrate mootness is a heavy one." *Sugarman v. Vill. of Chester*, 192 F. Supp. 2d 282, 290 (S.D.N.Y. 2002) (internal quotation marks omitted). "The voluntary cessation of allegedly illegal conduct usually will render a case moot if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 375 (2d Cir. 2004) (internal quotation marks omitted). "[I]n general, if the claims of the named plaintiffs become moot prior to class certification, the entire action becomes moot." *Comer v. Cisneros*, 37 F.3d 775, 798 (2d Cir. 1994); *see also LaVoice v. UBS Fin. Servs., Inc.*, No. 11-CV-2308, 2013 WL 5380759, at *3 n.6 (S.D.N.Y. Sept. 26, 2013) (same).

Defendants attach exhibits to their Motion indicating that Standard and Hyland's have initiated a recall campaign and that consumers may receive a refund by "[s]imply call[ing] [their] customer service team," who will then "begin the process of refunding the product." (Recall FAQ.) However, this recall is insufficient to justify dismissal on mootness grounds. As an initial matter, "Defendants['] promise of a refund as of yet remains just that; none of Plaintiffs'

allegations in the Amended Complaint suggests that Plaintiff, or any class members, has received a refund, and there is nothing to suggest Defendants even know whom to compensate or how much each putative class member might claim by way of damages." *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 513 (S.D.N.Y. 2015). Indeed, Defendants have provided no information on their website or in their press release as to the procedures that must be followed, the scope of the refund available, and what amount, if any, will be refunded and to which consumers; in fact, the recall announcement made *no* mention of any refund to any consumers. (*See* Recall Announcement.)[3] That information is exclusively available on a discrete page of Hyland's website. (*See* Recall FAQ.) Accordingly, based on what has been presented to the Court, it cannot be said that it is "well advertised that [Standard and Hyland's] are willing to reimburse consumers" for purchasing the Teething Tablets, and thus "any potential recovery . . . that could inure to class members through a refund program is . . . somewhat illusory, as compared to a class action remedy." *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 553 (E.D.N.Y. 2017); *see also In re Scotts EZ Seed Litigation*, 304 F.R.D. 397, 416 (S.D.N.Y. 2015) ("If consumers do not realize the [offer] exists, it cannot be a superior alternative to a class action.").

Moreover, the GBL provides for a minimum amount of statutory damages. *See* N.Y. Gen. Bus. Law § 349(h) ("[A]ny person who has been injured by reason of any violation of this section may bring an action . . . to recover his actual damages or fifty dollars, whichever is greater."). "Thus, even assuming . . . Plaintiffs were able to prove injury, but their damages were

---

[3] Plaintiffs note that "[t]he refund program caps a consumer's damages at less than $20.00," (Pls.' Mem. in Opp'n to Mot. To Dismiss ("Pls.' Opp'n") 6 (Dkt. No. 62)), while Defendants contend that all consumers are entitled to "up to $20 with no proof of purchase, more if there are receipts," (Defs.' Reply in Supp. of Mot. To Dismiss ("Defs.' Reply") 4 (Dkt. No. 63)). However, no Party provides the Court with any judicially noticeable documents to verify which, if any, of these assertions is correct.

less than the statutory minimum, they would still be entitled to the minimum amount of statutory damages." *Leonard v. Abbott Labs., Inc.*, No. 10-CV-4676, 2012 WL 764199, at *27 (E.D.N.Y. Mar. 5, 2012). If this is such a case, which the Court cannot determine given the paucity of information regarding the recall in the record at this stage, Plaintiffs' damages would not be mooted, as they may be entitled to the statutory minimum, which may well be greater than their actual damages. *See In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543, 2016 WL 3920353, at *40 (S.D.N.Y. July 15, 2016) ("Because the recalls, even those sufficient to remedy the defects, do not compensate [the] [p]laintiffs fully for the damages sought here, the [c]ourt declines to exercise its discretion to dismiss the remaining claims as prudentially moot.").

Ultimately, "[t]he wisdom of . . . Plaintiffs' decision to forgo the [r]ecall program [may be] questionable," given the issues that may arise at the class certification stage, but "there is no bar preventing [t]he plaintiffs from forgoing compensation through a voluntary refund program in order to pursue their claims in a consumer class action." *Leonard*, 2012 WL 764199, at *26–27. Nonetheless, for the reasons stated above, the Court finds that Plaintiffs claims are not moot.[4]

---

[4] Defendants' reliance on *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208 (10th Cir. 2012) is misplaced. *Winzler* is a prudential mootness case where the recall process at issue was overseen by the National Highway Transportation Safety Administration ("NHTSA"), and the defendant was obligated by statute to undertake certain measures in instituting that recall. *Id.* at 1209. Here, Plaintiffs do not allege, and there is no judicially noticeable evidence of, a "remedial promise from a coordinate branch in hand," *id.* at 1210, but simply a voluntary recall effort initiated by Standard and Hyland's without any detail as to the procedures followed or the presence of "the great grinding gears of a statutorily mandated and administratively overseen national recall process," *id.* at 1211. Standard and Hyland's are not alleged to have a statutory obligation to notify consumers of the defect, nor are they alleged to have a "statutory duty to remedy the defect or noncompliance." *Id.* Furthermore, in *Winzler*, the plaintiff requested that (1) Toyota notify all owners of the defect and (2) Toyota repair or replace any faulty parts at no cost; the recall did both of these things. *See id.* Here, by contrast, Plaintiffs seek to recover damages in addition to declaratory and injunctive relief. (*See generally* Am. Compl.) Those

## 2. Standing

"[N]ot all standing is created equal, and, historically, courts in the Second Circuit have distinguished between Article III, statutory, and class standing." *Kacocha v. Nestle Purina Petcare Co.*, No. 15-CV-5489, 2016 WL 4367991, at *5 (S.D.N.Y. Aug. 12, 2016); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 481 (S.D.N.Y. 2014) ("[C]ourts in this district have recognized that the Second Circuit considers the questions of Article III, statutory, and class standing as distinct."), *reconsideration denied*, 2014 WL 6488219 (S.D.N.Y. Nov. 18, 2014). However, "Article III standing must be decided before the merits," *All. For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87 (2d Cir. 2006), while "class standing is often considered at the class certification stage of the litigation," *Kacocha*, 2016 WL 4367991, at *5 (internal quotation marks omitted). Accordingly, the Court will begin by addressing Plaintiffs' Article III standing before considering any remaining arguments at this stage.

"Federal courts are courts of limited jurisdiction," *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (internal quotation marks omitted), and "their powers [are] circumscribed at their most basic level by the terms of Article III of the Constitution, which states that they may hear only 'Cases' or 'Controversies,'" *Russman v. Bd. of Educ.*, 260 F.3d 114, 118 (2d Cir. 2001) (quoting U.S. Const. art. III, § 2, cl. 1). "[A]t [the] uncontroverted core [of the 'case or controversy' requirement] lies the principle that, at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural." *Id.* To establish that Plaintiffs' claims meet the minimum constitutional threshold, Plaintiffs must establish three things: "first, that [they] ha[ve]

---

damages, as discussed above, may exceed the amount offered by recall based on the availability of statutory damages.

sustained an 'injury in fact' which is both 'concrete and particularized' and 'actual or imminent'; second, that the injury was in some sense caused by the opponent's action or omission; and finally, that a favorable resolution of the case is 'likely' to redress the injury." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015) (citations omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

"That a suit may be a class action . . . adds nothing to the question of standing," because "even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975)); *see also Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 432 (S.D.N.Y. 2015) (same). Accordingly, "the relevant legal entity for determining whether Article III standing is proper is the named plaintiff(s), not the proposed class." *Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 553 (S.D.N.Y. 2016).

Defendants' standing argument is three-fold: (1) Plaintiffs have failed to adequately plead an economic injury, (*see* Defs' Mem. 10–11); (2) Plaintiffs lack standing to seek injunctive relief because the products are no longer available, (*see id.* at 12–13); and (3) Plaintiffs lack standing to pursue claims "relating to products they themselves did not purchase," (*id.* at 13–15). The Court will address each of these in turn.

### a. Economic Injury

Defendants' first argument is that Plaintiffs have failed to plead a concrete and individualized injury "because they have not shown how they have suffered any loss of money." (*Id.* at 11.) "Economic injury suffices as a form of injury-in-fact that meets the first element of

standing." *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 453 (E.D.N.Y. 2013) (citing *Watt v. Energy Action Educ. Found.,* 454 U.S. 151, 161 (1981)).  According to Defendants, Plaintiffs have failed to plead sufficient facts "to establish that the Products are 'worthless,'" and thus that they are entitled to a refund.  (Defs.' Mem. 11.)  The Court disagrees.  First, the Amended Complaint alleges that, in September 2016, the FDA expressly recommended "that consumers stop using [the Hyland's] products and dispose of any in their possession."  (Am. Compl. ¶ 29.)  The FDA reiterated this warning on January 27, 2017, "urg[ing] consumers not to [use] these products."  (*Id.* ¶ 39.)  In the wake of the FDA's September 2016 warning, Hyland's "discontinued distribution of its teething products in the United States."  (*Id.* ¶ 36.)  Then, on April 13, 2017, Standard announced that it was recalling all Hyland's Baby Teething Tablets and Hyland's Baby Nighttime Teething Tablets, and in so doing, stated that "[c]onsumers who have products which are being recalled should discard the product."  (Recall Announcement.)

In effect, Standard and Hyland's represented that the products were "safe," which has been belied by the FDA's pronouncements and the later recall.  (Am. Compl. ¶ 54.)  These representations "resulted in the purchase of [the] products," now allegedly worthless because they are "[i]n reality, . . . unsafe," given the FDA's warnings and Standard and Hyland's later recall and instruction to dispose of the product.  (*Id.* ¶¶ 54, 56.)  This is sufficient to allege an economic injury for purposes of standing.  *See Dubuisson v. Stonebridge Life Ins. Co.*, 887 F.3d 567, 574 (2d Cir. 2018) (finding that "payment of premiums on a void or voidable insurance policy" constituted "a concrete, economic injury"); *Reid v. GMC Skin Care USA Inc.,* No. 15-CV-277, 2016 WL 403497, at *4 (N.D.N.Y. Jan. 15, 2016) (finding that the plaintiffs had standing where they "allege that they purchased the [product] and that they were injured as a result because they would not have purchased the product had they known the . . . claims were

false and misleading"); *Quinn v. Walgreen Co.,* 958 F. Supp. 2d 533, 542 (S.D.N.Y. 2013) ("There is no question [the] plaintiffs have standing to assert claims relating to the product they *did* purchase." (emphasis in original)).  Defendants' argument regarding standing is essentially that the products were actually not unsafe, and thus Plaintiffs were not misled as to the products' safety.  (Defs.' Mem. 10–12.)  Said otherwise, Defendants argue that Plaintiffs "were not injured because their claims are meritless," a finding which would require the Court to "do what [it] cannot: decide the merits of the claim en route to determining its justiciability."  *Dubuisson*, 887 F.3d at 574.  As alleged, Plaintiffs purchased a product that they were later told to discard by the FDA *and Defendants* based on the FDA's statement that the product was unsafe for use.  Accordingly, based on these allegations, Plaintiffs have standing with respect to the Hyland's Teething Tablets they purchased.

### b.  Injunctive Relief

Plaintiffs claim standing to pursue injunctive relief in this Action, even though Defendants have discontinued the sale of the teething tablets.  The Court disagrees.  "Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111–12 (1983)).  "Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way."  *Id.*  Moreover, the Second Circuit has recognized that "threatened harm in the form of an increased risk of future injury may serve as injury-in-fact for Article III standing purposes," *Baur v. Veneman*, 352 F.3d 625, 633 (2d Cir. 2003), but "such injuries are only cognizable where the plaintiff alleges actual future exposure to that increased risk," *Nicosia*, 834 F.3d at 239; *see also*

*Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) ("In establishing a certainly impending future injury, . . . the plaintiff must establish how he or she will be injured prospectively and that the injury would be prevented by the equitable relief sought.").

The Second Circuit's recent decision in *Nicosia* is dispositive. In *Nicosia*, the plaintiff purchased a weight loss drug containing a dangerous substance, sibutramine, from Amazon.com. *See* 834 F.3d at 226. The plaintiff sued on behalf of a putative class, seeking, *inter alia*, an injunction to prevent Amazon from selling the drug purchased by the plaintiff, as well as other diet drugs containing the same substance that Amazon continued to offer for sale. *See id.* at 238. The Second Circuit held that the plaintiff "did not establish a likelihood of future or continuing harm," because "he ha[d] not shown that he [was] likely to be subjected to further sales by Amazon of products containing sibutramine." *Id.* at 239. Indeed, Amazon had ceased sales of the product purchased by the plaintiff, and the plaintiff "failed to allege that he intend[ed] to use Amazon in the future to by *any* products, let alone food or drug products generally or weight loss products in particular." *Id.*

As was the case in *Nicosia*, Plaintiffs here are pursuing injunctive relief based solely on past purchases, and they have not pled that they intend to purchase any products from any Defendants, let alone the relevant homeopathic teething products. (*See* Am. Compl. ¶¶ 4–5 (noting that the products have been "discarded" and "thrown out").) Moreover, Plaintiffs cannot establish a "present, immediate risk," *Baur*, 352 F.3d at 640 (italics omitted), because they have affirmatively pled that Standard and Hyland's have "discontinued distribution of [the] teething products in the United States," (Am. Compl. ¶ 36), and that Target and CVS have removed the product from their stores, (*see id.* ¶¶ 43–44). Consequently, those products, like the relevant product in *Nicosia*, are no longer available for purchase by Plaintiffs. *See Nicosia*, 834 F.3d at

239 (finding that the plaintiff cannot show a likelihood of further sales of the relevant product because, among other reasons, "Amazon has ceased selling [the product] on its website").

Accordingly, because all Defendants have ceased selling the products in question, and Plaintiffs have not otherwise alleged that they are "likely to be subjected to further sales by [Defendants] of [the relevant] products," Plaintiffs have failed to establish a likelihood of future or continuing harm. *Id.*; *see also Marino v. Coach, Inc.*, 264 F. Supp. 3d 558, 566 (S.D.N.Y. 2017) ("Because these [p]laintiffs, like Nicosia, are pursuing injunctive relief based solely on past purchases, like Nicosia, they lack Article III standing."); *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-4570, 2017 WL 3727230, at *6 (S.D.N.Y. Aug. 11, 2017) (finding that the plaintiff lacked standing to pursue injunctive relief where she "has not alleged that she will be harmed in the immediate future," but rather stated "that she will not make further . . . purchases from [the defendant] online until it changes its website," and thus "intends to avoid future harm"), *adopted* 2017 WL 3726050 (S.D.N.Y. Aug. 28, 2017); *Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 564–65 (S.D.N.Y. 2016) (holding that the plaintiff lacked standing to pursue injunctive relief where he "has not alleged that he will purchase [the defendant's] products in the future," and therefore "has not demonstrated a likelihood of future injury"); *Sitt v. Nature's Bounty, Inc.*, No. 15-CV-4199, 2016 WL 5372794, at *6 n.8 (E.D.N.Y. Sept. 26, 2016) ("The Second Circuit recently held that a plaintiff alleging false or misleading advertising claims lacks standing to seek injunctive relief where the defendant has stopped selling the product in question."). Moreover, "because [Plaintiffs] do[] not individually have standing to seek injunctive relief, [t]he[y] do[]

not have standing to seek injunctive relief on behalf of a putative . . . class." *Buonasera*, 208 F. Supp. 3d at 565 (citing *Simon* 426 U.S. at 40 n.20).[5]

Accordingly, the Court dismisses Plaintiffs request for injunctive relief for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).

### c.  Standing as to Products Plaintiffs Did Not Purchase

Lastly, Defendants contend that Plaintiffs "lack Article III standing to assert claims relating to products they themselves did not purchase."  (Defs. Mem. 13.)  As this Court has previously held, "in light of [*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012)], the Court thinks it logical that Article III jurisdiction survives at least modest variation among those products purchased or representations seen by the named plaintiff[s] on the one hand and the putative class members on the other." *Kacocha*, 2016 WL 4367991, at *10.  First, given the Court's decision regarding Plaintiffs' standing based on alleged economic injury,  Plaintiffs have "establish[ed] a case or controversy between the . . . named [P]laintiff[s] and the . . . named [D]efendant[s] regardless of whether Plaintiff purchased [all products]." *Moses v. Apple Hosp. REIT Inc.*, No. 14-CV-3131, 2016 WL 8711089, at *3 (E.D.N.Y. Sept. 30, 2016); *see also Petrosino v. Stearn's Prods., Inc.*, No. 16-CV-7735, 2018 WL 1614349, at *5 (S.D.N.Y. Mar. 30, 2018) (same); *Sitt¸* 2016 WL 5372794, at *4 ("[B]ecause [the] [p]laintiff has standing to assert a claim directly against each of the named [d]efendants,

---

5 Plaintiffs contend that "it is a metaphysical certitude" that Defendants will resume selling the allegedly defective products in the future.  (Pls.' Opp'n 8.)  Specifically, they note that the FDA issued a warning regarding the very same products in 2010, and the Defendants began reselling the product in 2011 after a similar recall effort, (*see* Am. Compl ¶¶ 22–24), only for the products to be recalled again in 2017, (Recall Announcement).  However, even if the Court were to assume that this pattern sufficed to allege a likelihood that Defendants will sell the product in the future, Plaintiffs do not allege that they likely would then purchase any of Defendants' products again.  Accordingly, as in *Nicosia*, Plaintiffs still fail to establish a likelihood of future or continuing harm.  *See* 834 F.3d at 239.

[the] [p]laintiff has satisfied the Article III standing requirement for class actions."). Second, as in *Kacocha*, "even assuming there is, somewhere, a line demarcating that permissible degree of variation between a plaintiff's claims and those of his putative class members from that quantum which destroys subject matter jurisdiction, the Court is satisfied that Plaintiff[s'] claims here are on the safe side of that line." *Kacocha*, 2016 WL 4367991, at *10. (citations omitted). Plaintiffs have pled that the FDA, in September 2016, "issued a warning to consumers that homeopathic teething tablets *and gels* may pose a risk to infants and children," and "recommend[ed] that consumers stop using these products and dispose of any in their possession." (Am. Compl. ¶ 29.) While it is true that only the tablets were recalled, (*see id.* ¶ 38; Recall Announcement), Plaintiffs allege that Standard and Hyland's "discontinued distribution of [the] teething products in the United States," without making any differentiation between tablets and gels, (Am. Compl. ¶ 36). While it may be, as Defendants argue, that the "lack of [the] same formulation" between the Hyland's Teething Tablets and Hyland's Teething Gel could be relevant as to the merits of Plaintiffs' claims regarding their safety and similarity—especially given the recall of only the Teething Tablets, (Defs.' Mem. 14 (internal quotation marks omitted))—and may pose a problem with regard to class standing, "the Court cannot conclude that the variation between the [formulations], even as described in Defendants['] Memorandum of Law, are meaningful enough to destroy subject matter jurisdiction—particularly when the Second Circuit did not find variation in risk profiles, interest rates, maturity, and subordination sufficient to warrant dismissal of a putative securities class action on Article III grounds in *NECA-IBEW*." *Kacocha*, 2016 WL 4367991, at *10; *see also Moses*, 2016 WL 8711089, at *3 ("In *NECA-IBEW*, the Second Circuit was unconcerned that the important differences among the offerings and tranches imperiled the plaintiff's Article III standing. Similarly here, [the] [p]laintiff's Article III

standing is not extinguished or jeopardized simply because her claim contains allegations regarding . . . shares she did not purchase." (citation and internal quotation marks omitted)).

The Court finds that Plaintiffs have the requisite Article III standing to pursue their claims, and "[t]o the extent Plaintiff[s] seek[] to maintain claims for products [t]he[y] did not purchase . . . those will be addressed upon motion for class certification." *Kacocha*, 2016 WL 4367991, at *11; *see also Segovia v. Vitamin Shoppe, Inc.*, No. 14-CV-7061, 2016 WL 8650462, at *3 (S.D.N.Y Feb. 5, 2016) (noting that "[o]nce Plaintiffs have satisfied their Article III standing requirements, *NECA-IBEW* thus instructs that . . . their ability to represent putative class members who purchased products plaintiffs have not themselves purchased is a question for a class certification motion" (internal quotation marks omitted)); *Ault v. J.M. Smucker Co.*, No. 13-CV-3409, 2014 WL 1998235, at *7 (S.D.N.Y. May 15, 2014) ("Whether the plaintiffs' injuries are sufficiently similar to those of the putative class members who purchased other products—and whether [the] plaintiffs will therefore adequately represent the interests of the class—is a question the [c]ourt will consider on a Rule 23 certification motion." (internal quotation marks omitted)).

Accordingly, because Plaintiffs have standing to pursue damages, and their damages claims are not moot, the Court will now turn to Defendants' Rule 12(b)(6) Motion to determine whether Plaintiffs have stated a claim.

### 3.  New York General Business Law Claim

"A plaintiff under [§] 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000); *see also RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14-CV-

6294, 2015 WL 5008762, at *3 (S.D.N.Y. Aug. 24, 2015) (same); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 409 (S.D.N.Y. 2015) (same); *Leider v. Ralfe*, 387 F. Supp. 2d 283, 292 (S.D.N.Y. 2005) (applying this standard to both NYGBL §§ 349 and 350). "To aid in the interpretation of the second element, the New York Court of Appeals has instructed that a deceptive act or practice has an 'objective definition,' whereby deceptive acts or practices— which may be acts or omissions—are 'limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Leider*, 387 F. Supp. 2d at 292 (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995)); *see also Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 (N.Y. 2002) (same). In other words, a violation of this section "requires that the defendant's conduct deceive a reasonable consumer in a material respect, work a harm to the public at large, and directly cause the plaintiff's injury." *Leider*, 387 F. Supp. 2d at 292.

"The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to [§] 349." *Goshen*, 774 N.E.2d at 1195 n.1; *see also RCA Trademark Mgmt.*, 2015 WL 5008762, at *3 (same); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 409 ("The same analysis [under § 349] applies to false advertising claims brought under Section 350."). "Additionally, neither Section 349 nor 350 require proof of reliance, . . . nor proof that defendants intended to mislead consumers." *In re Scotts EZ Seed Litig*, 304 F.R.D. at 409 (citing, *inter alia*, *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675 (N.Y. 2012)).[6]

---

[6] The Court notes that several courts have explained that "[i]n addition, § 350 requires— unlike § 349—that the plaintiff must demonstrate reliance on the allegedly false advertising," which "means that the plaintiff must 'point to [a] specific advertisement or public pronouncement' upon which he or she relied." *Leider*, 387 F. Supp. 2d at 292 (quoting *Small v. Lorillard Tobacco Co.*, 679 N.Y.S.2d 593, 600 (App. Div. 1998)) (collecting cases); *see also Zaccagnino v. Nissan N. Am., Inc.*, No. 14-CV-3690, 2015 WL 3929620, at *3 (S.D.N.Y. June 17, 2015) (same). The New York Court of Appeals, however, has made clear that "[j]ustifiable

Defendants contend that Plaintiffs "have failed to plausibly allege that they have been injured in any way," and that "Hyland's was the cause of any purported injury." (Defs.' Mem. 15.) Defendants claim that Plaintiffs "never allege that they viewed the [safety] statements prior to any alleged purchase of the Products," and that "[e]ven if the alleged representations were false, there are no facts alleged showing they 'caused' Plaintiffs any injury." (*Id.* at 16.) In response, Plaintiffs list seven paragraphs from the Amended Complaint wherein they "assert[ed] they purchased Defendants' products as a result of Defendants' misleading advertisements concerning the purported safety of their products and sustained injury when Defendants (and the FDA) instructed consumers to discard these products because they posed an unsafe risk to infants and toddlers." (Pls.' Opp'n 19.) For example, Plaintiffs allege that "Defendants have made false representations about their teething products, and . . . the representations . . . have the capacity, tendency, and effect of deceiving reasonable consumers," and that "[r]easonable consumers would believe that Defendants homeopathic teething products are safe[, when] [i]n reality, Defendants homeopathic teething products are unsafe." (Am. Compl. ¶ 54.) Plaintiffs go on to allege that "those representations were misleading in material respect to consumers, and resulted in the purchase of Defendants' products." (*Id.*) As to injury, Plaintiffs allege that they purchased a product sold by Defendants, (*see id.* at ¶ 4–5), that the product was deemed unsafe and that Plaintiffs were instructed to discard the product, (*see id.* ¶ 29, 39; *see also* Recall Announcement), and that they were therefore "substantially injured in the amount of the

---

reliance by the plaintiff is not an element of [sections 349 and 350]." *Koch*, 967 N.E.2d at 676; *see also In re Scotts EZ Seed Litig.*, 304 F.R.D. at 409 ("[N]either Section 349 nor 350 require proof of reliance . . . ."); *Koch v. Greenberg*, 14 F. Supp. 3d 247, 262 (S.D.N.Y. 2014) (same). Thus, Defendants' argument that "Plaintiffs have not affirmatively pled any reliance on Hyland's representations when making their purchases," (Defs.' Mem. 16), is not dispositive to the plausibility of Plaintiffs' GBL claims.

purchase price[]," (*id.* ¶ 56). While the pleadings are not a model of meticulousness—Plaintiffs, for example, do not allege the prices paid for the products, nor do they specifically state that they are the "reasonable consumers" discussed in the Amended Complaint, nor do they explain whether they had any interest in purchasing the products at issue separate and apart from the misrepresentations at issue—they are not merely conclusory. Plaintiffs allege that they purchased the products from Defendants, that the products contained false representations as to their safety, and that those representations resulted in the purchase of Defendants' products. (*Id.* ¶ 54.)

Defendants also contend that Plaintiffs fail to affirmatively allege that they *actually saw* any misleading statements made by Defendants with regard to the products at issue. (Defs.' Mem. 15–16.) It is true that "[t]o properly allege causation, a plaintiff must state in his complaint that he has seen the misleading statements of which he complains before he came into possession of the products he purchased." *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 8 F. Supp. 3d 467, 480 (S.D.N.Y. 2014) (citing *Gale v. Int'l Bus. Machs. Corp.*, 781 N.Y.S.2d 45, 47 (App. Div. 2004)); *see also Rapcinsky v. Skinnygirl Cocktails, L.L.C.*, No. 11-CV- 6546, 2013 WL 93636, at *6 n.3 (S.D.N.Y. Jan. 9, 2013) (same). Here, Plaintiffs describe, in detail, the Standard and Hyland's website, which "contained detailed 'Safety Information' about their products, including representations that the FDA had regulated its manufacturing, and provid[ed] an overall impression that their products were safe." (*Id.* ¶ 16.) Indeed, the website "even gave parents a . . . hypothetical about the safety of their products, positing that a 10-pound child would have to 'accidentally ingest, all at the same time, more than a dozen bottles of 135 Baby Teething Tablets before experiencing' certain adverse effects." (*Id.* ¶ 17.) Plaintiffs then go on to allege that "those representations were misleading in a material

respect to consumers, *and resulted in the purchase of Defendants' products*." (*Id.* ¶ 54 (emphasis added).) "The reasonable inference to be drawn from these allegations is that Plaintiff[s] saw the [Standard and Hyland's] website . . . described previously in the [Amended] Complaint, and [were] thus deceived into purchasing the products in question." *Goldemberg*, 8 F. Supp. 3d at 480 (citation omitted); *see also Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 147 (S.D.N.Y. 2014) ("To satisfy the causation requirement, nothing more is required than that a plaintiff suffer a loss because of defendants' deceptive act." (alterations and internal quotation marks omitted)). Moreover, as noted, Plaintiffs need not plead that they reasonably relied on the misrepresentations; they need only plead an objective misrepresentation that caused the injury at issue. *See Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 43 (E.D.N.Y. 2008) (noting that "[d]eceptive acts are defined objectively," and that "the Court of Appeals has been clear that a plaintiff *need not show* that s/he *relied* on the misrepresentations in order to have a claim" (alterations and internal quotation marks omitted) (citing, *inter alia*, *Stutman*, 731 N.E.2d at 612)). It may be that, after discovery, Plaintiffs cannot proffer evidence of the inference made from the pleadings, and thus the claim will fail for lack of causation and injury. However, the pleadings are sufficient at this stage for the case to proceed. Therefore, Defendants' Motion To Dismiss Plaintiff's GBL claims is denied.

### 4. Breach of the Implied Warranty of Merchantability

Plaintiffs' next claim is brought against Target and CVS for an alleged breach of the implied warranty of merchantability because, "[b]y placing Defendants' homeopathic teething products in the stream of commerce, Defendants were impliedly warranting that the products were reasonably safe, adequately tested for their intended use, and that they were of merchantable quality." (Am. Compl. ¶ 69.) Section 2-314 of the New York Uniform

Commercial Code states that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.Y. U.C.C. Law § 2-314(1). "The implied warranty of merchantability is a guarantee by the seller that its goods are fit for the intended purpose for which they are used and that they will pass in the trade without objection." *Guariglia v. Procter & Gamble Co.*, No. 15-CV-4307, 2018 WL 1335356, at *6 (E.D.N.Y. Mar. 14, 2018) (quoting *Wojcik v. Empire Forklift, Inc.*, 783 N.Y.S.2d 698, 700 (App. Div. 2004)).

Defendants argue that "the [r]etailers cannot be liable because there is no allegation that such defect could have been discovered through ordinary inspection." (Defs.' Mem. 17 (internal quotation marks omitted).) Indeed, "a retailer 'cannot be held liable for injuries sustained from the contents of a sealed product even though a test might have disclosed a potential danger' because 'there is no obligation upon it to make such a test.'" *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 422 (S.D.N.Y. 2011) (alterations omitted) (quoting *Brownstone v. Times Square Stage Lighting Co.*, 333 N.Y.S.2d 781, 782 (App. Div. 1972)); *see also Travelers Indem. Co. of Illinois v. Hunter Fan Co., Inc.*, No. 99-CV-4863, 2002 WL 109567, at *7 (S.D.N.Y. Jan. 28, 2002) ("[A] retailer cannot be held liable for injuries sustained from the contents of a sealed product even though . . . testimony ha[s] uncovered a potential danger; no such obligation is imposed on a retailer."); *Cosgrove v. Delves' Estate*, 315 N.Y.S.2d 369, 371 (App. Div. 1970) (dismissing claim for breach of warranty against retailer because "evidence established that she could not have discovered any danger by mere inspection [and s]he was not obligated under these circumstances to . . . test" the product); *Alfieri v. Cabot Corp.*, 235 N.Y.S.2d 753, 757 (App. Div. 1962) (holding that the retail seller was not liable "even though it might have discovered the dangerous character . . . by a test" because [t]here was no obligation

upon it to make such test"); *cf. Fagan v. AmerisourceBergen Corp.*, 356 F. Supp. 2d 198, 216 (E.D.N.Y. 2004) (noting that CVS may be liable where there is a claim that it "fill[ed] . . . a prescription of an adulterated drug," as opposed to distributing "a drug that was later determined to produce harmful side effects," which would not implicate a breach of any implied warranty). Here, Plaintiffs do not claim that the alleged safety risk from the Hyland's products could have been discovered by Target or CVS prior to the FDA's September 30, 2016 warning; in fact, the FDA's own findings were the result of a "laboratory analysis" that involved elevated levels of belladonna. (Am. Compl. ¶ 38.) Thus, to state a claim for breach of the implied warranty of merchantability, Plaintiffs would have to allege that Target and CVS were obliged to test the product for belladonna *before* the FDA issued its warning on September 30, 2016, which they could not plausibly do. Indeed, Plaintiffs allege that *on the same day* the FDA issued its warning, which is the impetus for the allegation that the products were unsafe, CVS and Target both ceased all sales of the products and thus removed the products from the stream of commerce entirely. (*Id.* ¶¶ 43–44.) There is no allegation that Target or CVS had any special knowledge outside of the FDA's announcement that would have rendered them liable under a negligence theory of liability. Ultimately, Target and CVS are retailers, without any "knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed," N.Y. U.C.C. Law § 2-104(1), and thus cannot be held liable for a breach of an implied warranty of merchantability for a safety defect they could not have plausibly discovered. Therefore, this claim is dismissed.

### 5. Breach of Contract

Plaintiffs allege, "in the alternative" that CVS and Target breached a contract forged with Plaintiffs by "failing to compensate Plaintiffs and the Class for the damages

sustained due to Plaintiffs' and the Class members' purchase of the Defendants' unsafe homeopathic teething products."  (Am. Compl. ¶¶ 74–75.)  "To state a claim for breach of contract under New York law, a plaintiff must allege (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."  *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 468 (S.D.N.Y. 2014) (alterations and internal quotation marks omitted).  Additionally, the pleadings "must allege the provisions of the contract upon which the claim is based," *Atkinson v. Mobil Oil Corp.,* 614 N.Y.S.2d 36, 37 (App. Div. 1994); *accord Phoenix Four, Inc. v. Strategic Res. Corp.,* No. 05-CV-4837, 2006 WL 399396, at *10 (S.D.N.Y. Feb. 21, 2006) (collecting cases), and the defendants' acts or omissions that constitute the breach at issue, *see Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 183 (S.D.N.Y. 2009) ("[The] plaintiff must provide specific allegations as to the agreement between the parties, the terms of that agreement, and what provisions of the agreement were breached as a result of the acts at issue." (footnote, alteration, and internal quotation marks omitted)).  "[S]tating in a conclusory manner that an agreement was breached does not sustain a claim of breach of contract."  *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 189 (S.D.N.Y. 2011) (internal quotation marks omitted).

Here, Plaintiffs' Amended Complaint does not plead the purported contract at issue in this Action, "which itself may be fatal."  *Marshall*, 51 F. Supp. 3d at 468; *see also Transaero, Inc. v. Chappell*, No. 13–CV–5752, 2014 WL 1783732, at *10 (E.D.N.Y. May 6, 2014) (noting that "[a] breach of contract claim will withstand a motion to dismiss only if plaintiff alleges the essential terms of the parties' purported contract in

nonconclusory language, including the specific provisions of the contract upon which liability is predicated" (alteration and internal quotation marks omitted)). The Court cannot divine what contract, if any, was entered into between CVS and/or Target and Plaintiffs. Indeed, based on Plaintiffs' own pleadings, it appears that Plaintiffs' breach of contract claim is simply meant to reiterate the breach of implied warranty of merchantability claim. (*See* Am. Compl. ¶ 74 ("To the extent Defendants CVS's and Target's sale of Defendants' homeopathic teething products is deemed not to be a warranty under New York's Uniform Commercial Code, Plaintiffs plead in the alternative under common law contract law.").) However, Plaintiffs have not alleged what, if any, express warranties were made by CVS and/or Target. Nor has Plaintiff pled the existence of an implied in fact contract, as there is nothing in the pleadings to indicate "[a] promise made by the defendant [that was] sufficiently certain and specific so that the parties' intentions [we]re ascertainable." *Betty, Inc. v. PepsiCo, Inc.*, 283 F. Supp. 3d 154, 167 (S.D.N.Y. 2017) (internal quotation marks omitted).

Because Plaintiffs have not alleged any of the terms of the agreement, it is impossible for the Court to determine whether Target and CVS have breached the supposed contract. *See Emerald Town Car of Pearl River, LLC v. Phila. Indem. Ins. Co.*, No. 16-CV-1099, 2017 WL 1383773, at *7 (S.D.N.Y. Apr. 12, 2017) ("A complaint fails to sufficiently plead the existence of a contract if it does not provide factual allegations regarding, inter alia, the formation of the contract, the date it took place, and the contract's major terms. Conclusory allegations that a contract existed or that it was breached do not suffice." (italics, citation, and internal quotation marks omitted)); *Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 312 (S.D.N.Y. 2014)

(holding that the plaintiff failed to allege the existence of an agreement between the parties where the complaint alleged, "in a conclusory fashion, that there was an express contractual relationship between the parties, but it d[id] not include any details regarding this alleged express contract" (internal quotation marks omitted)); *Held v. Macy's, Inc.*, 2009 WL 3465945, at *14  (N.Y. Sup Ct. Oct. 19, 2009) (holding that there was no breach of contract claim against because the plaintiff "cite[d] to no language in any of the documents that could possibly be construed as the contract at issue" and did not "allege[] how Macy's breached the contract since she [did] not allege[] specific provisions under which [the] [d]efendant failed to comply").  Accordingly, Plaintiffs' breach of contract claim is dismissed.

### III.  Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted in part and denied in part.  Defendants' Motion is granted with respect to Plaintiffs' breach of the implied warranty of merchantability claim, the breach of contract claim, and the claim for injunctive relief, and is denied in all other respects.  Because Plaintiffs have already amended their Complaint once, these claims are dismissed with prejudice.  *See Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around"); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (granting motion to dismiss with prejudice where "[the] [p]laintiff has already had two bites at

the apple, and they have proven fruitless" (alterations and internal quotation marks omitted)).

The Clerk of the Court is directed to terminate the pending Motion. (Dkt. No. 59.)

SO ORDERED.

Dated:      September 28, 2018
               White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE